**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**


WELKER BEARING COMPANY,

      Plaintiff,                        Case No. 06-13345
                                       Hon. Gerald E. Rosen

v.

PHD, INC.,

      Defendant.
_____/

**OPINION AND ORDER REGARDING**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT AND**
**DEFENDANT'S MOTION FOR CLAIM CONSTRUCTION**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     December 12, 2007    

PRESENT: Honorable Gerald E. Rosen
United States District Judge

## I. INTRODUCTION

Plaintiff Welker Bearing Company commenced this suit in this Court on July 25, 2006, alleging that certain pin clamps offered or sold by Defendant PHD, Inc. infringe two patents held by Plaintiff. Defendant denies these allegations of infringement, and also has asserted an affirmative defense of patent invalidity. This Court's jurisdiction rests upon Plaintiff's assertion of claims under the federal patent laws, 35 U.S.C. § 1 *et seq.* See 28 U.S.C. § 1338(a).

Through cross-motions filed on May 31 and June 18, 2007, each of the parties

seeks summary judgment in its favor as to the infringement or non-infringement of the two patents-in-suit, U.S. Patent No. 6,786,478 (the "'478 patent") and U.S. Patent No. 6,913,254 (the "'254 patent"). In addition, Defendant filed a May 31, 2007 motion seeking the Court's acceptance of its proposed construction of claim 1 of the '254 patent.

Each of these motions has been fully briefed by the parties, and the Court heard oral argument on these motions on November 29, 2007. Having reviewed the parties' written submissions and the record as a whole, and having considered the arguments of counsel at the November 29 hearing, the Court now is prepared to rule on these three motions. This opinion and order sets forth the Court's rulings on these matters.

## II. FACTUAL BACKGROUND

Although the specific patent claims and products involved in this suit are discussed in greater detail below, as pertinent to the particular issues raised by the parties, it is helpful at the outset to describe the general nature of the inventions and products at issue here. In particular, this case concerns pin clamps that are used, in the automobile industry and in other industrial settings, to hold a work piece (such as a sheet of metal) securely in place during welding or other manufacturing processes. These pin clamps feature a locating pin that is inserted into a hole in the work piece, whereupon clamping fingers emerge out of the locating assembly and hold the work piece in place.

Plaintiff Welker Bearing Company and one of its contract employees, Joseph M. Pavlik, jointly own the rights to two patents for such pin clamps. The first of the two patents-in-suit, U.S. Patent No. 6,786,478 (the "'478 patent"), was issued on September 7,

2004. The second patent-in-suit, U.S. Patent No. 6,913,254 (the "'254 patent"), was issued on July 5, 2005. Mr. Pavlik has granted Plaintiff an exclusive license to all of his rights in these two patents.

The two patents-in-suit are quite similar. Indeed, the patent examiner initially rejected the '254 patent on non-statutory "double patenting" grounds. To overcome this rejection, Plaintiff executed a "Terminal Disclaimer" on January 12, 2005, under which Plaintiff disclaimed the terminal part of the statutory term of the '254 patent that otherwise would have extended beyond the expiration of the '478 patent.

In this case, Plaintiff asserts that these patents are infringed by two of Defendant's products. Defendant began development of the first of these products, the "PHD Series PLC Clamp I" ("Clamp I"), in late 2003, in response to the demands of one of its major customers, General Motors. During the development process, Defendant's employees were shown one of Plaintiff's pin clamps, but Defendant denies that it saw the internal workings of Plaintiff's clamp until October of 2004. As discussed in greater detail below, Defendant contends that Clamp I never proceeded beyond the prototype phase, that only a handful were made, and that none were sold. Defendant further asserts that it did not engage in any sort of commercial activity relative to Clamp I at any point after the '478 patent was issued on September 7, 2004.

On November 15, 2004, the parties met to discuss the possibility of licensing the '478 patent. When these discussions failed to produce an agreement, Defendant commenced an effort to design around Plaintiff's patent. This process resulted in the

second of Defendant's products at issue here, the "PHD Series PLC Clamp II" ("Clamp II"), which was made commercially available in June of 2005. As addressed below, the disposition of this infringement suit turns largely upon the extent of Defendant's success in designing around the inventions disclosed in the two patents-in-suit.

## III. ANALYSIS

### A. Defendant's Motion for Claim Construction

#### 1. The Law Governing Defendant's Motion

The Court turns first to Defendant's motion for claim construction, in light of the impact of this matter upon the issues raised in the parties' remaining motions. The interpretation of patent claims is "exclusively within the province of the court." Markman v. Westview Instruments, Inc., 517 U.S. 370, 372, 116 S. Ct. 1384, 1387 (1996). The principal focus of claim construction is the language of the claims themselves, as "the claims are of primary importance, in the effort to ascertain precisely what it is that is patented." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks and citation omitted). "[T]he words of a claim are generally given their ordinary and customary meaning" — that is, "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13 (internal quotation marks and citations omitted). In some cases, this "ordinary meaning" is simply the "widely accepted meaning of commonly understood words," but it may prove necessary in other cases to consider whether a claim's terms "have a particular meaning in a field of art" that is "not

immediately apparent" to those outside this field.  415 F.3d at 1314.

While claim construction begins with the language of the claim itself, it bears emphasis that a patent's claims "do not stand alone," but rather "are part of a fully integrated written instrument" that also includes a specification.  415 F.3d at 1315 (internal quotation marks and citation omitted).  Thus, "claims must be read in view of the specification, of which they are a part," and the specification is "the single best guide to the meaning of a disputed term."  415 F.3d at 1315 (internal quotation marks and citation omitted).  Moreover, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  415 F.3d at 1313. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  415 F.3d at 1316 (internal quotation marks and citation omitted).

Beyond the four corners of the written instrument, the Court also may consider "intrinsic evidence" — consisting of "the complete record of the proceedings before" the Patent and Trademark Office ("PTO"), including "the prior art cited during the examination of the patent" — and "extrinsic evidence" — which includes "expert and inventor testimony, dictionaries, and learned treatises."  415 F.3d at 1317 (internal quotation marks and citations omitted).  Yet, the intrinsic evidence "is less useful for claim construction purposes" than the claim language itself, and the extrinsic evidence is still "less significant than the intrinsic record in determining the legally operative

meaning of claim language." 415 F.3d at 1317 (internal quotation marks and citations omitted). With these standards in mind, the Court turns to the claim construction task implicated by Defendant's motion — namely, the interpretation of the disputed elements of claim 1 of the '254 patent.

> **2.      The Reference in Claim 1 to a "Mechanism" for Moving Clamping Fingers Into and Out of the Locating Assembly Discloses a Means-Plus-Function Limitation Governed by 35 U.S.C. § 112 ¶ 6.**

Although the parties fault each other for their failure to reach an agreement as to precisely which aspects of claim 1 remain in dispute, it is evident from their submissions that Plaintiff and Defendant disagree only as to one element of this claim. Specifically, the parties dispute the meaning to be given to the claim language referencing a "mechanism" for moving the pin clamp's fingers into and out of the locating assembly. Through the present motion, Defendant contends that the term "mechanism" as used in claim 1 should be viewed as a means-plus-function limitation, such that this term must be construed as encompassing only the corresponding structure described in the patent specification for performing the function of this "mechanism." The Court agrees.

The disputed term is found near the end of claim 1, which reads in its entirety:

1. A locating and clamping assembly comprising:

> a body defining an internal cavity and an opening from said cavity to the exterior of said body;

> a locating pin disposed in said cavity and extending along an axis A out of said opening to a distal end;

> an actuator for moving said locating pin rectilinearly along said axis

6

> A into and out of said opening;
>
> at least one finger supported by said locating pin adjacent said distal end;
>
> said assembly characterized by a ***mechanism*** for moving said finger along a straight line into and out of said locating pin perpendicular to said axis A in response to said rectilinear movement of said locating pin.

(Defendant's App'x, Ex. D, '254 patent at 8:12-24 (emphasis added).) Apart from their dispute over the term "mechanism," the parties evidently agree as to the ordinary and customary meaning that should be assigned to the remaining elements of this claim.

As to this sole disputed element, the parties' disagreement turns upon whether the term "mechanism" dictates that this element be construed as a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6. Under this statutory provision, a claim element "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof," in which case the claim "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. As the Federal Circuit has explained, § 112 ¶ 6 "permit[s] the use of purely functional language in claims," but "limit[s] the breadth of such claim language by restricting its scope to the structure disclosed in the specification and equivalents thereof." Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1582 (Fed. Cir. 1996).

"In determining whether a claim limitation is a means-plus-function limitation, the use of the word 'means' creates a presumption that § 112, ¶ 6 applies." Wenger

Manufacturing, Inc. v. Coating Machinery Systems, Inc., 239 F.3d 1225, 1232 (Fed. Cir. 2001) (internal quotation marks and citation omitted). By the same token, if the word "means" does not appear, the limitation in question "is presumptively ***not*** subject to [§] 112 ¶ 6." Massachusetts Institute of Technology v. Abacus Software (hereafter "MIT"), 462 F.3d 1344, 1353 (Fed. Cir. 2006) (emphasis added). Nonetheless, "a limitation lacking the term 'means' may overcome the presumption against means-plus-function treatment if it is shown that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." MIT, 462 F.3d at 1353 (internal quotation marks and citations omitted). In this case, Defendant argues that the presumption against means-plus-function treatment is overcome by the use of the term "mechanism" in a purely functional way, unaccompanied by any sort of language suggestive of a structure that performs the function of this "mechanism."

As Defendant points out, MIT itself was a case in which the Federal Circuit held that a claim's reference to "mechanism" was synonymous with "means," and hence was properly construed as disclosing a means-plus-function limitation. The patent in that case "disclose[d] a color processing system for producing copies of color originals," and one of the elements of claim 1 of this patent was a "colorant selection mechanism" that received "appearance signals" derived from a scanned original image and selected "corresponding reproduction signals" that would result in a "colorimetrically-matched reproduction." MIT, 462 F.3d at 1348. The district court construed the phrase "colorant

8

selection mechanism" as a means-plus-function limitation, and the Federal Circuit affirmed:

> We agree with the district court's conclusion that the presumption here [against means-plus-function treatment] is overcome and that the phrase "colorant selection mechanism should be construed as a means-plus-function limitation. The generic terms "mechanism," "means," "element," and "device," typically do not connote sufficiently definite structure . . . .

> Here, the patentee used "mechanism" and "means" as synonyms. At least one dictionary definition equates mechanism with means. *See The Random House Webster's Unabridged Dictionary* 1193 def. 2 (2d ed. 1998) (defining "mechanism" as "the agency or means by which an effect is produced or a purpose is accomplished"); *see also The Random House Dictionary of the English Language — The Unabridged Edition* 889 (1973) (same). The term "mechanism" standing alone connotes no more structure than the term "means."

462 F.3d at 1354 (citations omitted).

In so ruling, the court distinguished an earlier decision, Greenberg, supra, 91 F.3d at 1583-84, in which another Federal Circuit panel had held that the phrase "detent mechanism" did not trigger means-plus-function treatment under § 112 ¶ 6. In Greenberg, the district court had concluded that "detent mechanism" was subject to § 112 ¶ 6, in part "because the term did not describe a particular structure but described any structure that performed a detent function." Greenberg, 91 F.3d at 1583. The Federal Circuit found this reasoning insufficient to justify means-plus-function treatment:

> . . . [T]he fact that a particular mechanism — here "detent mechanism" — is defined in functional terms is not sufficient to convert a claim element containing that term into a "means for performing a specified function" within the meaning of section 112(6). Many devices take their names from the functions they perform. The examples are innumerable, such as "filter," "brake," "clamp," "screwdriver," or "lock." Indeed, several

of the devices at issue in this case have names that describe their functions, such as "graspers," "cutters," and "suture applicators."

"Detent" (or its equivalent, "detent mechanism") is just such a term. Dictionary definitions make clear that the noun "detent" denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms. It is true that the term "detent" does not call to mind a single well-defined structure, but the same could be said of other commonplace structure terms such as "clamp" or "container." What is important is not simply that a "detent" or "detent" mechanism" is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art.

91 F.3d at 1583 (citations omitted).

Despite some similarity in the language at issue — "colorant selection mechanism" in <u>MIT</u> versus "detent mechanism" in <u>Greenberg</u> — the court in <u>MIT</u> nonetheless found that <u>Greenberg</u> was distinguishable:

Claim language that further defines a generic term like "mechanism" can sometimes add sufficient structure to avoid [§] 112 ¶ 6. For example, in *Greenberg v. Ethicon Endo-Surgery, Inc.,* 91 F.3d 1580 (Fed. Cir. 1996), which involved a mechanical device, we held that [§] 112 ¶ 6 did not apply to the term "detent mechanism" because "the noun 'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms." *Id.* at 1583. The court recited several dictionary definitions for "detent," including "a mechanism that temporarily keeps one part in a certain position relative to that of another, and can be released by applying force to one of the parts." *Id.* (internal quotation marks and citations omitted). These definitions connoted sufficient structure to avoid [§] 112 ¶ 6 . . . .

In contrast, the term "colorant selection," which modifies "mechanism" here, is not defined in the specification and has no dictionary definition, and there is no suggestion that it has a generally understood meaning in the art. We therefore agree with the district court that "colorant selection mechanism" does not connote sufficient structure to a person of ordinary skill in the art to avoid [§] 112 ¶ 6 treatment.

MIT, 462 F.3d at 1354 (footnotes omitted).

Returning to the present case, this Court readily concludes that the claim language at issue here is far more analogous to the "colorant selection mechanism" of MIT than to the "detent mechanism" of Greenberg. As explained in MIT, "[t]he term 'mechanism' standing alone connotes no more structure than the term 'means.'" MIT, 462 F.3d at 1354. It follows that a "mechanism" should ordinarily be construed as a means-plus-function limitation absent accompanying claim language that is suggestive of structure, at least to a person of ordinary skill in the relevant art. This, then, was the crucial distinction between the claim language addressed in Greenberg and in MIT — the additional "detent" qualifier in the former case was found to be a "name for structure" that had a "reasonably well understood meaning in the art," Greenberg, 91 F.3d at 1583, while the "colorant selection" modifier in the latter case lacked any comparable structural connotation that was "generally understood in the art," MIT, 462 F.3d at 1354.

The term "mechanism" as used in claim 1 of the '254 patent is still further along the means-plus-function spectrum than the "colorant selection mechanism" under consideration in MIT, because the reference to a "mechanism" in this case is utterly unaccompanied by *any* language that is suggestive of structure, whether specific or generic. As stated earlier, the pertinent portion of claim 1 discloses a locating and clamping assembly that is "characterized by a mechanism for moving said finger along a straight line into and out of said locating pin perpendicular to said axis A in response to said rectilinear movement of said locating pin." All that can be said about this

11

"mechanism" is that it moves the device's clamping fingers into and out of the locating pin in a direction perpendicular to the axis along which the locating pin travels, and that it does so in response to the "rectilinear movement" of the locating pin into and out of an opening in the clamping assembly.

While this claim language discloses the *function* to be performed by the referenced "mechanism" — namely, to move the clamping fingers in a specified direction in response to the movement of the locating pin — it says nothing at all about any sort of *structure* for performing this function. Nor is the generic term "mechanism" modified or further defined by any accompanying claim language that might connote structure, whether under an ordinary dictionary definition or to a person of ordinary skill in the relevant art. Rather, the term "mechanism" stands alone, and therefore "connotes no more structure than the term 'means.'" MIT, 462 F.3d at 1354. It follows that the presumption against means-plus-function treatment has been overcome, and that the "mechanism" referred to in claim 1 of the '254 patent must be construed in accordance with § 112 ¶ 6 — *i.e.,* it must be restricted in scope "to the structure disclosed in the specification and equivalents thereof." Greenberg, 91 F.3d at 1582.

Although Plaintiff suggests a number of grounds for avoiding this result, the Court finds none of them persuasive. First and foremost, Plaintiff contends that the need for *any* construction of claim 1 of the '254 patent has been obviated by Defendant's purported concession in discovery that all of the claim's terms should be given their "ordinary meaning." As evidence of Defendant's purported "admission" on this point,

Plaintiff cites (i) the deposition testimony of Defendant's vice president, William Davenport, who was designated as the firm's deponent under Fed. R. Civ. P. 30(b)(6), and (ii) Defendant's objection to Plaintiff's interrogatory requesting that Defendant identify any claim terms that should be given a "special meaning" rather than their "common and ordinary meaning."

Contrary to Plaintiff's assertion, the Court sees nothing in Defendant's conduct during discovery that might constitute any sort of "waiver" of Defendant's opportunity to advocate a particular claim construction in the course of dispositive motion practice. First, in the deposition testimony cited by Plaintiff, Mr. Davenport was not asked to offer any sort of construction of the term "mechanism" as used in claim 1. Rather, he was asked only (i) whether Defendant's allegedly infringing product "has a mechanism for moving [a clamping] finger along a straight line into and out of the locating pin," (ii) whether the straight line along which the clamping finger moves in Defendant's product is "perpendicular to the axis that has the rectilinear movement of the locating pin," and (iii) whether the mechanism in Defendant's product moves the clamping fingers "in response to rectilinear movement of the locating pin." (Plaintiff's Response, Ex. A, Davenport Dep. at 156-57.) By acknowledging that Defendant's product has such a "mechanism," Mr. Davenport was in no way confirming, or even postulating, that claim 1 of the '254 patent should be construed as encompassing any and all pin clamps that have any sort of "mechanism," as that term is commonly understood, for performing the

function described in this claim.[1]  Indeed, nothing in the cited passage of his deposition

testimony can be viewed as an expression of any opinion whatsoever as to how ***any***

element of claim 1 should be construed, much less whether any of this claim's terms

might trigger means-plus-function treatment under § 112 ¶ 6.[2]  Instead, Mr. Davenport

merely was asked to confirm that ***Defendant's*** product had certain features and performed

certain functions as identified by Plaintiff's counsel.  The Court is at a loss to see how this

testimony can be viewed as reflecting, much less limiting, the claim construction

positions that Defendant would or could advocate in its dispositive motion practice.

Neither can the Court discern how Defendant's objection to an interrogatory might

be construed as either (i) an acknowledgment that Plaintiff's view of the "ordinary

meaning" of claim 1 was correct, or (ii) a waiver of any opportunity to propound a means-

plus-function reading of the term "mechanism" as used in this claim.  In the interrogatory

---

[1]Moreover, and for what it is worth, Mr. Davenport further opined at his deposition that
the mechanisms used in Plaintiff's and Defendant's competing products were "[w]holly
different," with Plaintiff's pin clamp using a "pivoting motion" to move the clamping fingers out
of the locating pin and Defendant's product using purely "linear motion" to achieve this result.
(Id. at 81.)

[2]Of course, even if Mr. Davenport had offered an opinion on this latter subject, Plaintiff
has failed to suggest a reason why any weight should be given to the testimony of a lay witness
on a legal issue reserved to the Court.  See Lighting World, Inc. v. Birchwood Lighting, Inc., 382
F.3d 1354, 1358 (Fed. Cir. 2004) ("The task of determining whether the limitation in question
should be regarded as a means-plus-function limitation, like all claim construction issues, is a
question of law for the court.")  At most, Mr. Davenport's testimony might reflect how a person
of ordinary skill in the relevant art might read and understand the language of the claim.  On this
point, however, his testimony seemingly suggests precisely the opposite of what Plaintiff would
read into it, where he opined that the parties had settled upon two wholly different structures for
accomplishing the function assigned to the "mechanism" in claim 1.

in question, Defendant was asked to identify any terms in the patents-in-suit that it believed should be given a "special meaning different from the[ir] common and ordinary meaning." (Plaintiff's Response, Ex. B, Interrogatory No. 10.) Defendant responded by objecting to the interrogatory as "premature," where "[d]iscovery ha[d] just begun," no deadlines had been set "relative to claim construction issues," and Plaintiff purportedly had yet to "identif[y] what claims of the patents-in-suit it contends to have been infringed and [which of Defendant's] products it believes to embody one or more of the claims of the patents-in-suit." (Id.) Because Defendant evidently did not supplement this response at any point during discovery, Plaintiff surmises that Defendant should be bound by the "ordinary meaning" of the terms of claim 1.

This argument is riddled with flaws, both factual and logical. First, the Court notes that Defendant's above-quoted discovery objection was merely an early salvo in a protracted squabble, spanning essentially the entire discovery period, over the timing, sequencing, and sufficiency of the parties' discovery responses regarding matters of claim construction. Plaintiff promptly responded to Defendant's objection by moving to compel full and complete responses to its first set of interrogatories. Yet, in a stipulated order dated December 27, 2006, the scheduled hearing on Plaintiff's motion was cancelled in light of Defendant's agreement to supplement certain of its interrogatory responses. Notably, the interrogatory now identified by Plaintiff was not mentioned in this stipulated order — instead, this order recited Defendant's broader agreement to "provide its claim construction pursuant to a scheduled exchange as agreed to by

counsel." (12/27/2006 Order at 2.) Since the parties did not exhibit any particular

reluctance to seek the Court's intervention in their discovery disputes, the Court can only

assume that Defendant satisfactorily discharged this obligation.[3]

In any event, Plaintiff fails to explain why the means-plus-function construction

advanced in Defendant's motion should qualify as a "special meaning" that Defendant

was obligated to identify in response to Plaintiff's interrogatory, as opposed to merely an

"ordinary" meaning that happens to differ from the "ordinary" meaning that Plaintiff

would assign to the term "mechanism" as used in claim 1. To the extent that Plaintiff

means to suggest that judicial claim construction is unnecessary so long as the parties

agree that a claim's terms should be given their "ordinary meaning," this unduly

discounts the capacity of patent litigants to argue over what this "ordinary meaning"

should be. As one court recently observed, "parties in patent cases rarely agree on the

'ordinary meaning [of patent terms] as understood by a person of skill in the art,' so that

asserting that such a meaning should apply, without further construction, merely begs the

question of what that meaning is." Maytag Corp. v. Electrolux Home Products, Inc., 411

F. Supp.2d 1008, 1037 (N.D. Iowa 2006) (alteration in original). Likewise, it begs the

_____

[3]While the record does not, of course, encompass the entirety of the requests, responses, and documents exchanged by the parties during discovery, there is at least some evidence that Defendant alerted Plaintiff to a possible means-plus-function interpretation of the "mechanism" language of claim 1. Specifically, in a second supplemental response to Plaintiff's interrogatory number 6, Defendant asserted that "the same or equivalent 'mechanism' for moving a finger in response to said rectilinear movement of the locating pin, as disclosed in the specification and claimed in Claim 1 of the 254 patent, is not found in [Defendant's allegedly infringing products] either literally or under the Doctrine of Equivalents." (Plaintiff's 5/10/2007 Motion to Compel, Ex. I, Defendant's Second Supplemental Responses to Plaintiff's First Set of Interrogatories.)

question in this case to appeal, without further discussion or explanation, to the "ordinary meaning" of the term "mechanism," because the "ordinary meaning" of this term, along with the words that accompany or modify it, determines whether means-plus-function treatment is warranted. Accordingly, the Court rejects Plaintiff's unstated premise that Defendant has advanced some sort of novel claim construction position by urging a means-plus-function interpretation of claim 1.

More fundamentally, even if Plaintiff could establish some element of sandbagging or "unfair surprise" in Defendant's motion — and the record falls well short of such a showing — there is no indication of any resulting prejudice or need for remedial measures. If, for example, Defendant had provided misleading or incomplete discovery responses that caused Plaintiff to forgo a particular line of inquiry, the proper remedy at this juncture would be a request for additional discovery pursuant to Fed. R. Civ. P. 56(f). Indeed, Plaintiff has made just such a request in response to one of the grounds advanced in Defendant's other pending motion, arguing that Defendant seeks to rely on a prior art reference that was not timely identified during discovery. In its response to Defendant's motion for claim construction, in contrast, Plaintiff fails to suggest any impediment to its ability to advocate an interpretation of claim 1 that differs from the one sought by Defendant. Consequently, the Court sees no reason to abstain from construing the disputed terms of claim 1, at least to the extent that such claim interpretation is a necessary predicate to the resolution of the parties' cross-motions for summary judgment.

Having addressed Plaintiff's threshold procedural challenges to Defendant's

request for a judicial construction of claim 1 of the '254 patent, the Court turns to Plaintiff's substantive challenges, such as they are, to the particular claim construction advocated by Defendant. Beyond terse expressions of surprise, with little or no accompanying explanation, that Defendant has failed to discuss certain decisions that Plaintiff views as most relevant to the claim construction inquiry,[4] Plaintiff first contends that Defendant has failed to produce the "substantial amount of proof" that purportedly is necessary to overcome the presumption against means-plus-function treatment of claim elements that lack the word "means." Yet, the decision in MIT belies any such claim of an onerous evidentiary burden, where the court in that case relied solely on (i) language within the four corners of the patent-in-suit, (ii) a dictionary definition that "equates mechanism with means," and (iii) the absence of evidence that the modifying "colorant selection" language had "a generally understood meaning in the art." MIT, 462 F.3d at 1354.

There is even less of a need here for Defendant to supply a "substantial amount of proof" in order to overcome the presumption against means-plus-function treatment. As explained earlier, and in contrast to the claim language at issue in MIT, the term "mechanism" in claim 1 of the '254 patent is utterly unaccompanied by *any* language that modifies this "generic term" or that might connote "sufficient structure to avoid [§] 112 ¶

---

[4]Plaintiff chides Defendant, for example, for its "incredibl[e]" failure to discuss the Federal Circuit's Greenberg decision. Apart from the fact that Greenberg is, in fact, addressed in Defendant's motion, albeit only in a footnote, any arguable omission in this regard is overcome by Defendant's extensive reliance on the MIT decision, which in turn discusses Greenberg at length and finds it distinguishable.

6." MIT, 462 F.3d at 1354. Rather, the accompanying language merely discloses the *function* that this "mechanism" performs, without in any way suggesting a structure that might perform this function. Under these circumstances, it is enough for Defendant to point to (i) the Federal Circuit's express recognition that "[t]he term 'mechanism' standing alone connotes no more structure than the term 'means,'" MIT, 462 F.3d at 1354, and (ii) the absence of any accompanying claim language that might be understood by a person of ordinary skill in the art as connoting a structure that performs the stated function. Certainly, with the one possible exception discussed below, Plaintiff has not identified any such language in claim 1 that supplies the structure that is otherwise lacking in the unadorned reference to "mechanism" alone. In a relatively easy case like the present one, where the term "mechanism" is "simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for,'" Lighting World, supra, 382 F.3d at 1360, the Court is confident that Defendant need not shoulder a particularly heavy burden in overcoming the presumption against means-plus-function treatment.

Plaintiff next contends that Defendant's proposed construction of claim 1 runs afoul of the doctrine of claim differentiation, under which each claim in a patent is presumed to have a different scope. See Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998).[5] If claim 1 were construed as including a means-

_____

[5]Once again, Plaintiff prefaces its argument on this issue with a pointless and utterly gratuitous declaration that Defendant has failed to address the "leading case" on this subject.

19

plus-function limitation, thereby restricting its scope by reference to the corresponding structure described in the patent specification, Plaintiff submits that the result would be to eliminate a significant distinction between independent claim 1 and dependent claims 4, 5, and 6.  In particular, claims 4 through 6 add structure to the "mechanism" of claim 1, disclosing that this "mechanism" includes a rotating central post.  Yet, this same "rotating central post" limitation would be incorporated into claim 1, by way of the patent specification, if this claim's reference to the term "mechanism" were construed as a means-plus-function limitation.

As recognized in Comark Communications, however, "the doctrine of claim differentiation is not a hard and fast rule of construction," but rather establishes only a "presumption that each claim in a patent has a different scope."  Comark Communications, 156 F.3d at 1187.  Indeed, the Federal Circuit has expressly emphasized, in decisions both before and after Comark Communications, that "the judicially developed guide to claim interpretation known as 'claim differentiation' cannot override . . . the express mandate of section 112(6)."  Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1538 (Fed. Cir. 1991); see also Wenger Manufacturing, supra, 239 F.3d at 1233.  Moreover, the court has cautioned that "[a] means-plus-function limitation is not made open-ended by the presence of another claim specifically claiming the disclosed structure which underlies the means clause or an equivalent of that structure," as such a rule of construction "would provide a convenient way of avoiding the express mandate of section 112(6)."  Laitram Corp., 939 F.2d at 1538.

This same reasoning defeats Plaintiff's appeal in this case to the doctrine of claim differentiation.  Regardless of whether a means-plus-function limitation might diminish, or even eliminate, the distinction between claim 1 and claims 4 through 6 of the '254 patent, the Court has already explained why, in its view, there is simply no tenable reading of the term "mechanism" and the surrounding language of claim 1 that would connote sufficient structure to avoid the application of § 112 ¶ 6.  The situation was different in Wenger Manufacturing, 239 F.3d at 1233-34, for example, where the court applied the doctrine of claim differentiation to ensure that a means-plus-function limitation was confined strictly to those "structural limitations from the written description that are []necessary to perform the claimed function."  Thus, while the Court is mindful, as discussed below, of a similar need here to avoid the sweeping importation into claim 1 of structural elements that are not necessary to fulfill the function of the "mechanism" disclosed in that claim, the Court cannot allow a rule of construction to override the statutory command of § 112 ¶ 6 where, as here, a claim element is stated in purely functional terms.

Plaintiff next suggests that Defendant's proposed construction of claim 1 is somehow undermined by the Federal Circuit's recent decision in Applied Medical Resources Corp. v. United States Surgical Corp., 448 F.3d 1324 (Fed. Cir. 2006).  Yet, the parties in that case agreed almost entirely as to the proper construction of the claim at issue, and the court found that the one possible point of dispute was not preserved for appeal.  See Applied Medical Resources, 448 F.3d at 1332-33 (electing to "apply the

undisputed claim construction adopted by the district court").  The significance of that decision, then, lies not in its discussion of claim construction principles, but rather — as Plaintiff itself characterizes it — in its "enunciat[ion] [of] a precise process for determining *infringement* of a 'means plus function' claim."  (Plaintiff's Response Br. at 7 (emphasis added).)  Plaintiff does not explain what bearing, if any, <u>Applied Medical Resources</u> should have on the proper disposition of Defendant's motion for claim construction, and its relevance likewise is not evident to the Court.

Next, and rather remarkably, Plaintiff requests that the Court permit "full briefing" on the issue of claim construction, so that the parties and the Court alike may "not only decide the claims that need to be evaluated, but also clarify the decisions to be made, and the standards against which those decisions need to be framed."  (<u>Id.</u> at 8.)  Yet, Plaintiff fails to suggest any reason why the parties' *existing* round of briefing on Defendant's present motion for claim construction would not qualify as the desired "full briefing" on this subject.  Neither has Plaintiff identified any impediment to its opportunity to fully address all of the issues of relevance to the Court's claim construction effort within the four corners of its response to Defendant's motion.  To the contrary, Plaintiff appears to have accurately identified the points — or, more accurately, the single point — upon which the parties disagree in light of the arguments raised and interpretations propounded in Defendant's motion, and has taken the opportunity in its response to advance various reasons why its proposed construction should prevail over Defendant's as to this single point of contention.  Under these circumstances, the Court finds no basis for permitting

supplemental briefing on issues that have been thoroughly addressed and debated in the parties' initial round of briefs, as well as at oral argument.

Indeed, at the November 29 hearing, Plaintiff and its counsel suggested for the first time that claim 1 does, in fact, disclose structure corresponding to its "mechanism" element. In particular, Plaintiff contends that the term "mechanism" should be construed as part and parcel of the "actuator" referenced earlier in claim 1. Plaintiff further asserts that an "actuator," like the "detent" qualifier in Greenberg, supra, 91 F.3d at 1583, is a "name for structure" that has a "reasonably well understood meaning in the art." In Plaintiff's view, then, the close relationship between the "actuator" and "mechanism" elements of claim 1 obviates the need to consult the patent specification to determine the structure corresponding to the latter element.

This proposed construction, however, cannot be squared with either the language of claim 1 itself or the overall patent of which it is a part. First and foremost, claim 1 discloses an "actuator" and a "mechanism" as ***two distinct elements*** that perform ***different functions***. Under the express language of the claim, the "actuator" performs the function of "moving said locating pin rectilinearly along said axis A into and out of said opening" in the device's locating and clamping assembly. The "mechanism," in contrast, performs the function of "moving said finger along a straight line into and out of said locating pin perpendicular to said axis A in response to said rectilinear movement of said locating pin." To be sure, these functions are related, with the "mechanism" moving the device's clamping fingers "in response to" the actuator's movement of the locating pin.

23

Yet, the two functions are nonetheless distinct, as the claim itself makes clear by disclosing them in two separate elements. There is simply no basis in the language of claim 1 for treating the "mechanism" as somehow ancillary to, and structurally defined by reference to, the "actuator" that serves a wholly distinct purpose in the overall device.

The specification confirms this distinction. It summarizes the invention as including an "actuator" that "moves the locating pin rectilinearly along the axis into and out of the opening" in the locating assembly, as well as a "mechanism" that "rotates in response to the rectilinear movement of the locating pin for moving the finger radially." ('254 patent at 2:21-27.) It then devotes entire paragraphs to separately defining and describing (i) an "actuator 52" that is mounted to the body of the locating assembly and connected to the locating pin through a pin mount, and that performs the function of "rectilinearly moving the locating pin 12 along the axis A" using a combination of a piston, coupler, and coupler plate, (id. at 4:56-5:18), and (ii) a "mechanism 68" that includes a rotating central post "disposed between the actuator 52 . . . and the fingers" that "rotates in response to the rectilinear movement" of the actuator, as well as a "motion converter" that converts the rotational movement of the central post into radial movement of the fingers, (id. at 6:3-27).

The separate functions and structures of the "actuator" and "mechanism" are emphasized in the description of the latter's central post as "independent from" the actuator's piston in order to "separat[e] the rotational movement of the central post 70 from the rectilinear movement of the locating pin 12." (Id. at 6:14-16.) Similarly, the

24

accompanying figures depict the "actuator" and "mechanism" as wholly distinct parts of the device with separate, albeit adjacent, structural components. Thus, if one were to review only those portions of the specification addressing the "actuator," no hint could be found of any structure corresponding to the distinct function performed by the "mechanism" in the patented device. Likewise, if one were to construct an "actuator" in accordance with the specification, the resulting component would not perform the function assigned to the "mechanism" — namely, moving the device's clamping fingers in a straight line into and out of the locating pin in a direction perpendicular to the axis along which the locating pin moves.

The Federal Circuit has recognized a presumption that the use of different terms "connotes different meanings." CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co., 224 F.3d 1308, 1317 (Fed. Cir. 2000); see also Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1119 (Fed. Cir. 2004) (explaining that the use of "different terms in a claim" raises the inference that the applicant "intended his choice of different terms to reflect a differentiation in the meaning of those terms"); Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 93 F.3d 1572, 1579 (Fed. Cir. 1996) (holding that the "plain meaning" of the claim at issue in that case would "not bear a reading" under which two different claim terms were construed as describing a single element). Plaintiff has not identified any basis for overcoming this presumption here, but instead offers only its counsel's bare assertion at the November 29 hearing that the terms "actuator" and "mechanism" are used interchangeably in claim 1. Because such a reading

is contrary to both the language of the claim itself and the patent as a whole, the Court adheres to its determination that the term "mechanism" discloses a means-plus-function limitation governed by § 112 ¶ 6.

There remains only the question of precisely how the Court should construe this means-plus-function limitation. As noted earlier, the application of § 112 ¶ 6 dictates that the "mechanism" referenced in this claim must be restricted in scope "to the structure disclosed in the specification and equivalents thereof." Greenberg, 91 F.3d at 1582. Yet, the Court must take care not to "import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." Wenger Manufacturing, 239 F.3d at 1233. In this case, this means that the Court should look to the specification only for those structural limitations that are necessary to perform the function of the "mechanism" referenced in claim 1 — *i.e.,* the function of "moving said finger along a straight line into and out of said locating pin perpendicular to said axis A in response to said rectilinear movement of said locating pin."

In Defendant's view, this facet of the Court's claim construction inquiry is entirely straightforward, and flows directly from the description of the "mechanism" as disclosed in the specification. In particular, the specification describes this "mechanism" as "rotat[ing] in response to the rectilinear movement of the locating pin . . . to move the fingers . . . radially." (Defendant's App'x, Ex. D, '254 patent at 5:67-6:2.) The specification then discloses the structural elements that achieve this function:

26

The mechanism 68 includes a central post 70 disposed between the actuator 52 at a first end 72 and the fingers 60 at a second end 74 . . . . The central post 70 rests on a surface 76 of the coupler plate 56, which rectilinearly moves the central post 70 in response to the rectilinear movement of the actuator 52. The central post 70 rotates in response to the rectilinear movement. The surface 76 of the coupler plate 56 in contact with the central post 70 functions as a thrust bearing to facilitate the rotational movement of the central post 70 . . . .

A motion converter 84 converts the rotational movement of the central post 70 into radial movement of the fingers 60. As shown in FIG. 7, the converter 84 includes the slots 64 in each of the fingers 60 and dowels 86 extending axially from the second end 74 of the central post 70 and into each of the slots 64, respectively. The dowels 86 are offset from the axis A for radially moving the fingers 60 in response to rotational movement of the central post 70 . . . .

The rotational movement of the central post 70 moves the dowels 86 along an arcuate path. As the dowels 86 move through the respective slots 64, which are straight, the dowels 86 force the fingers 60 to move radially to maintain the slots 64 in alignment with the dowels 86 . . . .

. . . [A] pair of cams 90 and corresponding cam followers 92 interconnect the central post 70 and the body 16 for rotating the central post 70 in response to the rectilinear movement of the locating pin 12. The pair of cams 90 and the corresponding cam followers 92 are disposed on opposite sides of the axis A. The pair of cams 90 and corresponding cam followers 92 stabilize the central post 70 to allow the central post 70 to rotate smoothly within the cavity 18.

(Id. at 6:3-55.)

Whether in its response to Defendant's motion or through the arguments of its

counsel at the November 29 hearing, Plaintiff has failed to identify any specific respect in

which Defendant's proposed construction of claim 1's means-plus-function limitation

impermissibly imports either (i) functional limitations that are not recited in the claim

itself or (ii) structural limitations that are unnecessary to perform the claimed function.

27

Instead, Plaintiff has focused its arguments almost exclusively upon the threshold question whether the term "mechanism" as used in claim 1 warrants means-plus-function treatment under § 112 ¶ 6. Having resolved this more general question in Defendant's favor, the Court adopts Defendant's construction of the claim's means-plus-function limitation as essentially unopposed.[6]

**B.      The Parties' Cross-Motions for Summary Judgment**

**1.      The Standards Governing the Parties' Cross-Motions**

Through the remaining two cross-motions pending before the Court, each party seeks summary judgment in its favor as to the question whether Defendant's products infringe the two patents-in-suit. In addition, Plaintiff seeks summary judgment in its favor as to the willfulness of Defendant's alleged infringement of the patents-in-suit, and Defendant, in turn, seeks summary judgment in its favor as to the invalidity of the asserted claims of the '254 patent on various grounds. Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[6]In any event, and as will become clear below, many of the structural details of the "mechanism" as described in the '254 patent specification are not material to the determination whether Defendant's products infringe this patent. To the extent that the precise contours of this "mechanism" bear upon the question of infringement, the Court will consider below whether, as Plaintiff's counsel generally asserted at the November 29 hearing, Defendant has impermissibly sought to import functional or structural limitations from the specification beyond what is necessary to meet the dictates of § 112 ¶ 6.

Three 1986 Supreme Court cases — <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) — ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in <u>Celotex</u>:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

<u>Celotex</u>, 477 U.S. at 322.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989); see also Nernberg v. Pearce, 35 F.3d 247, 249 (6th Cir. 1994). The Court will apply these standards in resolving the parties' cross-motions for summary judgment.

2. **Defendant's Clamp II Does Not Infringe the '478 or '254 Patents, Whether Literally or Under the Doctrine of Equivalents.**

As the principal ground advanced in its cross-motion for summary judgment, Defendant argues that its "PHD Series PLC Clamp II" product ("Clamp II") does not infringe either of the two patents-in-suit, whether literally or under the doctrine of equivalents. In support of this contention, Defendant first points to Plaintiff's apparent concession that this clamp does not infringe the '478 patent. Defendant further contends that this product does not infringe the '254 patent as properly construed, where its Clamp II lacks the "mechanism" that is recited in the asserted claims of this patent — namely, a mechanism that features a rotating central post that causes the device's clamping fingers to move radially into and out of the locating pin in response to the rotational movement of the central post. As discussed below, the Court agrees on both scores.

a. **The Law Governing the Court's Infringement Inquiry**

This Court's infringement inquiry is governed by a two-step analytical framework. See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 149 F.3d 1309, 1315 (Fed. Cir. 1998); Kahn v. General Motors Corp., 135 F.3d 1472, 1476 (Fed. Cir. 1998). First, the pertinent claims must be construed to determine their meaning and scope. See Ethicon Endo-Surgery, 149 F.3d at 1315. To the extent necessary in this case, the Court

already has performed this task in response to Defendant's motion for claim construction.

Next, the claims as construed must be compared to the accused device or system. <u>Ethicon</u>

<u>Endo-Surgery</u>, 149 F.3d at 1315. To establish literal infringement, the plaintiff must

demonstrate by a preponderance of the evidence "that every limitation in the claim is

literally met by the accused device." <u>Kahn</u>, 135 F.3d at 1476. Alternatively, under the

doctrine of equivalents, the plaintiff may establish infringement by demonstrating that

"there is 'equivalence' between the elements of the accused product or process and the

claimed elements of the patented invention." <u>Kahn</u>, 135 F.3d at 1478 (internal quotation

marks and citations omitted).

The Federal Circuit has somewhat refined this general infringement inquiry to

address the specific context of means-plus-function limitations. In particular, "[l]iteral

infringement of a means-plus-function claim limitation requires that the relevant structure

in the accused device perform the identical function recited in the claim and be identical

or equivalent to the corresponding structure in the specification." <u>Applied Medical</u>

<u>Resources</u>, 448 F.3d at 1333. "Once the relevant structure in the accused device has been

identified, a party may prove it is equivalent to the disclosed structure by showing that the

two perform the identical function in substantially the same way, with substantially the

same result." 448 F.3d at 1333. "Structural equivalence under § 112, ¶ 6 is met only if

the differences are insubstantial." <u>Odetics, Inc. v. Storage Technology Corp.</u>, 185 F.3d

1259, 1267 (Fed. Cir. 1999) (citation omitted).

        **b.**     **Defendant's Clamp II Lacks the Rotating Central Post That Is**

**Included as a Limitation in Both of the Patents-in-Suit.**

Turning first to the claim that Defendant's Clamp II infringes the '478 patent, no extended analysis is necessary to resolve this question. Rather, as Defendant correctly observes, the individual designated as Plaintiff's representative under Fed. R. Civ. P. 30(b)(6), Joseph Pavlik, admitted at his deposition that Clamp II does not infringe the '478 patent:

> Q:    All right. It's your view that the second design [*i.e.,* Clamp II], or the company's view, that the second design infringes the 4[78] and 254 patents?
>
> A:    No. It only infringes the 254, from what I've seen.
>
> Q:    As you understand it, the second design does not include a mechanism for rotating in response to rectilinear motion as required by —
>
> A:    Correct.
>
> Q:    — 478?
>
> A:    Correct.
>
> \* \* \* \*
>
> Q:    . . . . You know sitting here today that the product that PHD has in the marketplace . . . does not have a mechanism for rotating, causing the fingers to move in a linear fashion, correct?
>
> A:    That's correct.

(Defendant's App'x, Ex. H, Pavlik Dep. at 116-17.)[7]  Plaintiff does not contend otherwise

---

[7]The Court notes that Mr. Pavlik's concession as to the "mechanism for rotating" limitation in the '478 patent is dictated by the express language of claim 1 of this patent, which

in its response to Defendant's motion, or elsewhere in its present round of briefing. Accordingly, Defendant is entitled to summary judgment in its favor as to the claim that its Clamp II product infringes the '478 patent.

The infringement analysis as to the '254 patent is not much more complex, in light of Plaintiff's election to largely forgo any sort of alternative arguments in the event that the Court might conclude — as it has now done — that claim 1 of this patent recites a means-plus-function limitation that in turn requires a rotating central post (or its equivalent). As to the first prong of this analysis in the context of a means-plus-function limitation, Defendant does not dispute that the "mechanisms" in claim 1 and in Defendant's Clamp II product perform the same function as recited in the claim — namely, moving the clamping fingers along a straight line into and out of the locating pin in a direction perpendicular to the axis along which the locating pin travels, in response to the rectilinear movement of the locating pin. Accordingly, the key question in the Court's literal infringement inquiry is whether the relevant structure that performs this function in Defendant's Clamp II product is "identical or equivalent to" the corresponding structure in the '254 patent specification. Applied Medical Resources, 448 F.3d at 1333.

In lieu of addressing this question in its response to Defendant's summary judgment motion, Plaintiff instead revisits the central issue implicated by Defendant's

states in pertinent part that the locating and clamping assembly is "characterized by a mechanism for rotating in response to said rectilinear movement of said locating pin for moving said finger radially." (Defendant's App'x, Ex. F, '478 patent at 8:5-7.)

motion for claim construction — namely, the proper interpretation of claim 1 of the '254 patent. In particular, Plaintiff again contends that Defendant's Rule 30(b)(6) designate, Mr. Davenport, effectively "admitted" literal infringement through his deposition testimony acknowledging that Defendant's Clamp II has a "mechanism" that performs the function recited in claim 1. As explained earlier, however, Mr. Davenport was not asked to offer his construction of claim 1, but was merely asked about the features of Defendant's products. Indeed, it is precisely because the term "mechanism" is generic — thereby triggering, as the Court has explained, means-plus-function treatment of this element of claim 1 — that Mr. Davenport's testimony regarding the common *functions* disclosed in claim 1 and performed by Defendant's Clamp II has no legal significance to the *structural* equivalence inquiry now before the Court.

Plaintiff fares no better in its appeal to the patent examiner's stated reasons for allowance of the earlier '478 patent. Specifically, the patent examiner stated:

1. The following is an examiner's statement of reasons for allowance: A locating and clamping assembly having a body with an internal cavity and an opening; a locating pin; an actuator; and at least one finger in combination with the other claimed limitations.

2. The prior [art] has fingers that rotate which is different from radial movement . . . . Rotates turns about an axis and radial or radius is a line segment fixed to a point. The radial term shows how the fingers extend in a linear path from the center and not a rotational path as shown in the prior art. These limitations are neither anticipated nor rendered obvious by the prior art by being shown nor suggested.

(Plaintiff's Response, Ex. F, 4/22/2004 Reasons for Allowance at 1.) Plaintiff reasons that because the patent examiner allowed the earlier '478 patent without mentioning the

34

rotational movement that was expressly recited in claim 1 of this patent, it follows that such rotational movement could not have been necessary to the patentability of the subsequent '254 patent.

There are a number of problems with this argument. First, and as Defendant correctly observes, Plaintiff fails to account for or explain the patent examiner's explicit reference to ***"the other claimed limitations"*** in stating the reasons for allowance. These "other claimed limitations" include, of course, the "mechanism for rotating" that is expressly disclosed in claim 1 of the '478 patent. Moreover, nothing in the patent examiner's statement purports to express any opinion as to whether the term "mechanism" in the '478 patent might trigger means-plus-function treatment — and, needless to say, the examiner was in no position to interpret the term "mechanism" in the not-yet-filed application for the '254 patent. Finally, even if the patent examiner ***had*** expressed a view on the claim construction issue presented in this case, the Court would not be bound by it. See SRAM Corp. v. AD-II Engineering, Inc., 465 F.3d 1351, 1359 (Fed. Cir. 2006). Accordingly, the reasons for allowance of the '478 patent provide no basis for the Court to revisit the claim construction it adopted earlier.

Neither is the Court persuaded by the generalized assertion of Plaintiff's counsel at the November 29 hearing that Defendant has impermissibly consulted the '254 patent specification to the "n-th detail" in identifying the structure corresponding to the "mechanism" recited in claim 1. As Plaintiff observes, the Court's claim construction cannot stand to the extent that it "defin[es] a claimed function to require more than is

actually claimed" or fails to restrict the corresponding structure to that which is necessary to perform the claimed function. Applied Medical Resources, 448 F.3d at 1334. Yet, one need not venture far into the patent specification here to find the key structural component relied upon by Defendant. To the contrary, the *very first* detail that is disclosed about the "mechanism" is that it "includes a central post," and one need not read much further before learning that this central post "rotates in response to the rectilinear movement" of the actuator that moves the locating pin. ('254 patent at 6:3-11.)

Absent this rotating central post, the specification does not describe any means by which to carry out the function of moving the device's clamping fingers perpendicularly into and out of the locating pin in response to the movement of the locating pin. Nor did Plaintiff's counsel explain at the November 29 hearing how a claim construction that includes this feature might impermissibly broaden the function claimed for the "mechanism," or what sort of structure might be gleaned from the patent specification that would lack a rotating central post yet still perform the claimed function. Under these circumstances, the Court is confident that its construction of claim 1's means-plus-function limitation does not transgress the limits identified in Applied Medical Resources, 448 F.3d at 1334, particularly as to the crucial question whether the "mechanism" recited in this claim should be construed as including a rotating central post.

Having addressed and rejected Plaintiff's various attempts to revisit the claim construction issue, the Court turns to the essentially unrefuted body of evidence that Defendant has produced in support of its contention that the "mechanisms" in claim 1 and

in its Clamp II product are not structurally equivalent. First, Defendant points to the acknowledgments by both Plaintiff's Rule 30(b)(6) designate, Mr. Pavlik, and its expert, Robert Adams, that the structure in Defendant's Clamp II product that propels the clamping fingers into and out of the locating pin moves linearly and ***does not rotate***. (See Defendant's App'x, Ex. H, Pavlik Dep. at 116-17; Defendant's App'x, Ex. J, Adams Dep. at 22-23.) In contrast, claim 1 of the '254 patent, as construed by the Court, includes a ***rotating*** central post that causes the clamping fingers to move into and out of the locating pin. Plainly, then, the relevant structures in the '254 patent specification and in Defendant's Clamp II are not identical.

To establish literal infringement of a means-plus-function limitation, however, these structures need only be "equivalent" and their differences "insubstantial" — it is enough, in other words, that "the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." Odetics, 185 F.3d at 1267. Plaintiff's Rule 30(b)(6) witness, Mr. Pavlik, came very close, at a minimum, to conceding that the requisite structural equivalence does not exist here:

> Q:  Do you agree with me that if the mechanism for moving the finger that is referenced in Claim 1 of the 254 patent is determined by the Court to include or mean the rotating mechanism that you have described in the patent, that PHD's PLC Series II Clamp would not infringe the 254 patent?
>
> [Plaintiff's Counsel]:  Let me object to the form of the question. Again, it's calling for a hypothetical.

A:     Yes, if they read that, the body of 254.

(Defendant's App'x, Ex. H, Pavlik Dep. at 119-20.)  In addition, Defendant's expert,

Gary Novak, has opined that the "linear-moving driver and drive rod used to move the

fingers in the PLC Series II pin clamp are substantially different from the claimed

'mechanism for moving said finger' of the '254 patent because the methods by which the

two systems operate and the structure of the parts that comprise the two systems are

different."  (Defendant's App'x, Ex. L, Novak Aff. at ¶ 13.)

Whether in response to Defendant's summary judgment motion or elsewhere in its

submissions, Plaintiff has utterly failed to put forward evidence that raises a genuine issue

of material fact as to the structural equivalence of the "mechanisms" identified in the '254

patent and found in Defendant's Clamp II.  Instead, Plaintiff offers only the assertions of

its counsel, unsupported by citation to the record, that these two mechanisms perform the

same function "in substantially the same way" and that any differences are

"insubstantial."  (Plaintiff's Response Br. at 5.)[8]  The unsupported statements of counsel,

however, cannot overcome or call into question Defendant's affirmative evidence of

substantial structural differences.

Beyond this, Plaintiff offers only a critique of the opinions offered by Defendant's

_____

[8]Plaintiff's counsel goes even further in a subsequent reply brief in support of Plaintiff's
cross-motion, insisting that "[t]he issue in this case is not the mechanism, but what the
mechanism does — moves the clamp fingers linearly — in both [Plaintiff's] and [Defendant's]
pin clamp designs."  (Plaintiff's Reply Br. at 1.)  Much as Plaintiff and its counsel might wish to
frame the issues in this case in this fashion, the Court views the matter differently.  Plaintiff
certainly is entitled to rigidly adhere to one and only one construction of the '254 patent in all of
its submissions to the Court, but this strategy has its consequences.

expert, Mr. Novak. Yet, whether or not Mr. Novak has sufficiently acknowledged the asserted "fact" that Plaintiff's and Defendant's pin clamps "are the only two 'closed' devices when compared to the prior art," (Plaintiff's Response Br. at 5), this has nothing whatsoever to do with the validity of Mr. Novak's opinion on the wholly separate subject now under consideration — namely, whether the mechanisms in the '254 patent and in Defendant's Clamp II are structurally equivalent. Similarly, it is wholly beside the point whether Mr. Novak has sufficiently acknowledged the equivalence — and, indeed, complete identity — of the *functions* performed by these mechanisms, because Defendant does not contend that these functions are different. In the end, then, Defendant has established as a matter of law that its Clamp II does not literally infringe the '254 patent.

> **c.    Plaintiff Has Failed to Identify an Issue of Fact as to Infringement of the '254 Patent Under the Doctrine of Equivalents.**

This leaves only the possibility that Defendant's Clamp II product might infringe the '254 patent under the doctrine of equivalents. To whatever modest extent this inquiry might differ, under the particular circumstances of this case, from the foregoing literal infringement analysis, the Court readily reaches the same conclusion — that there is no record support for a claim of infringement under the doctrine of equivalents.

The Federal Circuit has explained that the equivalence analyses required under § 112 ¶ 6 and under the doctrine of equivalents, while "not coextensive," are nonetheless "closely related." Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc., 145

F.3d 1303, 1310 (Fed. Cir. 1998). "Thus, a finding of a lack of literal infringement for lack of equivalent structure under a means-plus-function limitation may preclude a finding of equivalence under the doctrine of equivalents." Chiuminatta, 145 F.3d at 1310. Moreover, one potential distinction between the two analyses is not pertinent here — while only § 112 ¶ 6, and not the doctrine of equivalents, demands a more exacting showing of "functional identity," Odetics, 185 F.3d at 1267, Defendant acknowledges that the record in this case establishes this element of the statutory standard.

Whatever the theoretical possibility that there could be an absence of equivalent structure for purposes of § 112 ¶ 6 but the accused device could nonetheless infringe under the doctrine of equivalents, the Court finds nothing in the record that could put this theory into practice here. Just as Plaintiff has failed to put forward any evidence pertinent to the structural equivalence inquiry under § 112 ¶ 6, it has similarly failed to offer any evidence from which a trier of fact could conclude that the mechanism in Defendant's Clamp II for moving its clamping fingers into and out of the locating pin differs "only insubstantially" from claim 1's means-plus-function limitation for performing the same function. See Ethicon Endo-Surgery, 149 F.3d at 1315. Indeed, Plaintiff makes no effort to pursue or support distinct claims of equivalence under § 112 ¶ 6 and under the doctrine of equivalents, but rather lumps all such arguments under a "doctrine of equivalents" heading. (See Plaintiff's Response Br. at 4-5.) As discussed above, these "arguments" consist of (i) unsupported assertions of equivalence by Plaintiff's counsel, and (ii) challenges to immaterial aspects of the opinion of Defendant's expert. Neither of these

40

carries any evidentiary weight, whether under § 112 ¶ 6 or under the doctrine of equivalents.

Moreover, Defendant has identified two additional reasons why Plaintiff's infringement claim cannot be saved by the doctrine of equivalents. First, Defendant points to Plaintiff's own belief, as stated through the testimony of its Rule 30(b)(6) designate, Mr. Pavlik, that the rotating central rod structure was superior in various respects to the linear-motion alternatives that Plaintiff had considered and rejected in the design process leading up to the patented inventions. (See Defendant's App'x, Ex. H, Pavlik Dep. at 21, 26-28.) Likewise, there is language in the '254 patent itself extolling the virtues of this rotating mechanism as allowing the locating assembly to "work[] faster, more efficiently, more precisely, and more uniformly," (Defendant's App'x, Ex. D, '254 patent at 2:25-30.) This evidence of the distinct advantages purportedly offered by a rotating central post undermines any claim of "insubstantial" differences between this structure and its linear-motion counterpart in Defendant's Clamp II.

Next, Defendant correctly observes that Plaintiff's evident awareness of this linear-motion alternative undercuts its appeal to the doctrine of equivalents. As explained by the Federal Circuit, one "important difference" between the doctrine of equivalents and the § 112 ¶ 6 equivalence standard is that the former is intended to protect against an inability to "predict the future." Chiuminatta Concrete Concepts, 145 F.3d at 1310. The court elaborated:

Due to technological advances, a variant of an invention may be developed

after the patent is granted, and that variant may constitute so insubstantial a change from what is claimed in the patent that it should be held to be an infringement. Such a variant, based on after-developed technology, could not have been disclosed in the patent. Even if such an element is found not to be a § 112, ¶ 6, equivalent because it is not equivalent to the structure disclosed in the patent, this analysis should not foreclose it from being an equivalent under the doctrine of equivalents.

145 F.3d at 1311. The court nonetheless concluded that this situation was not presented in the case before it, "where the equivalence issue does not involve later-developed technologies, but rather involves technology that predates the invention itself." 145 F.3d at 1311. In such a case, the court reasoned, "a finding of non-equivalence for § 112, ¶ 6, purposes should preclude a contrary finding under the doctrine of equivalents," because "given the prior knowledge of the technology asserted to be equivalent, it could readily have been disclosed in the patent." 145 F.3d at 1311.

So it is here, where the record reveals Plaintiff's awareness, active consideration, and rejection of the linear-motion alternative found in Defendant's Clamp II as it developed the pin clamps disclosed in its '478 and '254 patents. The doctrine of equivalents cannot be invoked under these circumstances to obtain a second "bite[] at the apple." 145 F.3d at 1311. Rather, the record forecloses as a matter of law any claim that Defendant's Clamp II infringes the '254 patent under the doctrine of equivalents.

3.      **There Is No Evidence That Defendant's Clamp I Was Made, Used, Sold, or Offered for Sale at Any Time After the First of the Two Patents-in-Suit Was Issued.**

As the next issue raised in its cross-motion for summary judgment, Defendant argues that its Clamp I product cannot be deemed to have infringed either of the patents-

in-suit, where the company allegedly abandoned this product and ceased any potentially

infringing activity prior to the issuance of the earlier of the two patents-in-suit, the '478

patent, on September 7, 2004.  The Court again agrees.

As Defendant points out, the mere existence of the Clamp I product cannot sustain

Plaintiff's claim of infringement as to this device, absence evidence that this product was

"used, sold, or offered for sale in the United States during the term of" the patents-in-suit.

Johns Hopkins University v. Cellpro, Inc., 152 F.3d 1342, 1366 (Fed. Cir. 1998); see also

35 U.S.C. § 271(a) (providing that a patent is infringed by one who "without authority

makes, uses, offers to sell, or sells any patented invention"); Cohen v. United States, 487

F.2d 525, 527 (Cl. Ct.  1973) ("It is axiomatic that there can be no infringement of a

patent prior to its issuance."); Black & Decker, Inc. v. Home Product Marketing, Inc., 929

F. Supp. 1114, 1120 (N.D. Ill. 1996).  In arguing that this condition is not satisfied here,

Defendant cites the testimony of one of its employees, Bruce McIntosh, that the design of

Clamp I was complete by April of 2004, that only about ten prototypes of this clamp were

made, and that the device was subjected only to in-house testing.  (Defendant's App'x,

Ex. M, McIntosh Dep. at 11, 25-26.)  Defendant further points to an affidavit provided by

the vice president of its clamp division, William Davenport, stating that there were no

production runs for Clamp I, that none of the prototypes was sold, and that there was

"[n]o commercial activity whatsoever" in relation to this product after the September 7,

2004 issuance of the '478 patent.  (Defendant's App'x, Ex. Y, Davenport Aff. at ¶ 3.)

Plaintiff's purported evidence to the contrary consists of inadmissible hearsay and

mischaracterizations of deposition testimony. First, Plaintiff points to Mr. McIntosh as having purportedly "admit[ted]" that the Clamp I product was given to Defendant's customer, General Motors, after the September 7, 2004 issuance of the '478 patent. (Plaintiff's Response Br. at 1.) In fact, in the cited portion of his testimony, Mr. McIntosh stated that during the in-house testing of the Clamp I device, one of the prototypes was taken and "show[n]" to General Motors. (McIntosh Dep. at 26-27.) More importantly, nothing in this testimony indicates *when* this might have occurred.[9] Plaintiff does not explain how this testimony could be viewed as evidence that Clamp I was used, sold, or offered for sale after September 7, 2004.

Plaintiff next cites a portion of Mr. Davenport's deposition testimony for the proposition that pricing of the Clamp I product "had been discussed as part of the offer of Clamp I for sale," presumably after the crucial date of September 7, 2004. (Plaintiff's Response Br. at 1-2.) In the cited excerpt, however, Mr. Davenport recounted a November 15, 2004 meeting between Plaintiff's and Defendant's representatives regarding a possible licensing arrangement, and he described the conversation as follows:

> They [*i.e.,* Plaintiff's representatives] didn't think that was amenable because they didn't want to spend the resources nor the money in a court battle. We [*i.e.,* Defendant's representatives] wholeheartedly agreed. We said what price are you going to sell these things for? They told us at the time $1100 per unit. I said, "You'll never sell them for that. The market is

---

[9]While Defendant suggests in its reply brief that the Clamp I prototype was shown to General Motors in the first half of 2004, the excerpt of Mr. McIntosh's deposition that Defendant cites for this proposition is far from clear on this point. Nonetheless, Plaintiff's counsel expressly acknowledged at the November 29 hearing that the Clamp I prototype was shown to General Motors at some point prior to the key date of September 7, 2004.

> $550, $700. Somewhere in there." We said, "Let us help you. We have
> world class manufacturing capabilities. We'll make parts for you and sell
> them to you at amenable rates so you can get into the market at least." That
> was not acceptable.

(Davenport Dep. at 72.) Plainly, the price figures referenced by Mr. Davenport in this

testimony reflected **Plaintiff's** intended pricing of **its** product. Plaintiff utterly

misrepresents the record by suggesting that this testimony evidences Defendant's pricing

of its Clamp I product, much less any offer of this product for sale.

Plaintiff also cites an electronic mail message sent by its president, Dale Van

Wulfen, to one of Defendant's officers, Peter Cole, shortly after the parties met in mid-

November of 2004 to discuss a possible licensing arrangement. This December 17, 2004

e-mail message states, in pertinent part:

> Bill [Davenport] has indicated that if Welker will not license, then phd will
> develop a clearly different mechanism. He also indicated that you are
> preparing a quote . . . . And he forthrightly stated that if an alternate were
> not developed and tested in a brief time, sale of any product infringing
> would be acknowledged and compensated.

(Plaintiff's Response, Ex. D.) Plaintiff views this message as evidence that Defendant

"was preparing a quote regarding its existing Design 1/Clamp 1 product." (Plaintiff's

Response Br. at 2.)

Even accepting Plaintiff's reading of this e-mail message, Defendant correctly

identifies at least two infirmities in this purported evidence of potentially infringing

activity after September 7, 2004. First, Mr. Van Wulfen's out-of-court statement about

what Mr. Davenport represented to him about Mr. Cole's preparation of a quote is double

hearsay (at least), and Plaintiff has failed to identify an evidentiary basis upon which the Court could properly consider it. See McFarland v. Bob Saks Toyota, Inc., 466 F. Supp.2d 855, 863 (E.D. Mich. 2006). Neither has Plaintiff explained how an assertion that a quote was being "prepar[ed]" — a threat that, so far as the record reveals, was never carried out — raises a genuine issue of fact as to Defendant's Clamp I product having been used, sold, or offered for sale after September 7, 2004. To the contrary, Mr. Van Wulfen's December 17, 2004 e-mail message seemingly suggests that, at least as of the date of this message, Defendant was still in the process of "preparing" a quote, and thus could not have already transmitted such a quote to its customers. And, once again, there is no evidence that such a quote was sent to any customer after that date (or at any time, for that matter) for the sale or purchase of the Clamp I product.

This leaves only the efforts of Plaintiff's counsel at the November 29 hearing to fill this evidentiary void. First, while counsel indicated that the discussions between Defendant and General Motors regarding the Clamp I product extended past September 7, 2004, he was unable to point to anything in the record that might support this proposition. As to counsel's suggestion that Defendant may be liable for infringement absent its affirmative withdrawal by September 7, 2004 of a preexisting offer to sell the Clamp I product, this presupposes that Defendant ever made such an offer in the first instance. Once again, however, the only evidence cited by Plaintiff on this subject is the deposition testimony of Mr. McIntosh that Defendant and General Motors had "discussions about price targets." (McIntosh Dep. at 27.) Nothing in the record indicates that these price

46

targets were actually achieved with respect to the Clamp I product, much less that these discussions ripened into an actual price quotation for this product that Defendant communicated to General Motors (or any other potential customer). The case law confirms that this evidence is insufficient as a matter of law to establish an "offer for sale" of Defendant's Clamp I product. See, e.g., MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp. 420 F.3d 1369, 1376 (Fed. Cir. 2005) (holding that e-mail messages that described a product but did not contain any price terms "cannot be construed as an 'offer' which [the customer] could make into a binding contract by simple acceptance"); Elan Corp. v. Andrx Pharmaceuticals, Inc., 366 F.3d 1336, 1341 (Fed. Cir. 2004) (explaining that "a communication that fails to constitute a definite offer to sell the product and to include material terms is not an 'offer' in the contract sense"); Moldflow Corp. v. Simcon, Inc., 296 F. Supp.2d 34, 44 (D. Mass. 2003) (observing that "[i]n order to create the power of acceptance, an offer must be sufficiently definite," and finding that the materials presented as "offers" in that case "lacked [several] terms necessary to create the power of acceptance on the part of the recipients"); cf. 3D Systems, Inc. v. Aarotech Laboratories, Inc., 160 F.3d 1373, 1379 (Fed. Cir. 1998) (holding that certain "price quotation letters" qualified as "offers to sell" because they conveyed "a description of the allegedly infringing merchandise and the price at which it c[ould] be purchased").

If Defendant had successfully developed a product that met the demands and "price targets" conveyed by an important customer, General Motors, one can be reasonably certain that it would have promptly offered to sell this product to this

47

customer. Tellingly, there is no evidence of such an offer.  Rather, Defendant's flat

denial, backed by evidence, of any commercial activity after September 7, 2004 stands

uncontradicted by anything in the record.  Accordingly, the Court concludes that

Defendant is entitled to summary judgment in its favor as to any claimed infringement of

the patents-in-suit flowing from the Clamp I product.[10]

---

[10]In light of the Court's determination that Defendant is entitled to summary judgment in its favor on Plaintiff's claims of infringement, the Court need not reach Defendant's various challenges in its motion to the validity of the '254 patent.  In any event, these challenges were predicated on the Court's acceptance of Plaintiff's rather than Defendant's construction of claim 1 of the '254 patent, but the Court instead has accepted Defendant's reading.  Neither does the Court reach Defendant's argument that the '254 patent is no longer enforceable in light of a purported misstatement made by Plaintiff in a filing with the patent office.  Finally, because the Court has decided the claims of infringement in Defendant's favor as a matter of law, it readily follows that Plaintiff's cross-motion for partial summary judgment must be denied.

# IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's May 31, 2007 motion for claim construction is GRANTED, in accordance with the rulings in this opinion and order. IT IS FURTHER ORDERED that Defendant's May 31, 2007 motion for summary judgment is GRANTED IN PART, as to the issue of Defendant's non-infringement of the patents-in-suit, and is otherwise DENIED AS MOOT. Finally, IT IS FURTHER ORDERED that Plaintiff's June 18, 2007 motion for partial summary judgment is DENIED.

                              s/Gerald E. Rosen
                              Gerald E. Rosen
                              United States District Judge

Dated:  December 12, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 12, 2007, by electronic and/or ordinary mail.

                              s/LaShawn R. Saulsberry
                              Case Manager